UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

CLEVELAND WITHERSPOON,              )
                    Plaintiff,              )
                                            )
          vs.                               )          1:06-cv-1423-LJM-WTL
                                            )
UNIVERSITY OF INDIANAPOLIS,        )
                    Defendant.             )

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on defendant's, University of Indianapolis (the

"University"), Motion for Summary Judgment.  Plaintiff, Cleveland Witherspoon ("Witherspoon"),

claims that the University discriminated against him based on his race and retaliated against him for

filing complaints of discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII") and 42 U.S.C. § 1981.  The University contends that Witherspoon has failed to evidence a

material issue of fact on several prima facie elements of his claims.

For the reasons stated herein, the Court concludes that Defendant's motion should be

**GRANTED**.

## I.  BACKGROUND

### A.  WITHERSPOON'S EMPLOYMENT & ENROLLMENT AT THE UNIVERSITY

Witherspoon began working for the University in August 1996 as a part-time assistant

football coach.  Witherspoon Dep. at 45-46.  Witherspoon was rehired as a part-time assistant

football coach each of the following five years.  *Id.* at 46-47.  In July 2001, Witherspoon was

promoted to a full-time position as an assistant football coach, weight and conditioning area and

program coordinator, track and field administrative assistant, and teacher in health and physical education. Am. Compl. ¶ 9; Witherspoon Dep. at 49-50, 54. During Witherspoon's tenure as an assistant football coach at the University, Head Football Coach Joe Polizzi ("Polizzi") was his immediate supervisor. Witherspoon Dep. at 53, 58.

Witherspoon enrolled as a student at the University in the fall of 1999. Wantz Aff. ¶ 4. In August of 2002, Witherspoon earned a Master of Arts degree in Curriculum and Instruction from the University. Wantz Aff. ¶ 5. In the spring term of 2004, Witherspoon was working to obtain a certification of mild intervention for special education. Witherspoon Dep. at 77.

### B.  THE UNIVERSITY'S OFF-DUTY CONDUCT POLICY

The University's Staff and Employee Handbook includes an off-duty conduct policy that provides:

> [E]mployees who engage in inappropriate, criminal or unprofessional off-duty conduct may be subject to disciplinary action up to and including termination.
>
> If you are involved in one of the circumstances below, you must notify your supervisor immediately:
>
> •      Arrested for or convicted of criminal conduct
> •      Lose or are threatened with the loss of a certificate or a license that is required to perform your job.

Clark Aff. Ex. A.

On May 17, 2004, Witherspoon signed an acknowledgment that he received a copy of the University's Staff and Employee Handbook, agreed to read it thoroughly and, if there was any policy he did not understand, to seek clarification from the Office of Human Resources. Witherspoon Dep.

at 65-66; Witherspoon Dep. Ex. 6.  Witherspoon received the Handbook four days prior to an arrest, and he did not have an opportunity to review the revised policy before then.  Witherspoon Dep. at 83.

### C.  THE POLIZZI CASE

On September 11, 2001, Polizzi was arrested in connection with a domestic incident.  Willey Aff. ¶ 5.  Polizzi contacted Dave Huffman ("Huffman"), his supervisor and the University's Director of Athletics at that time, from jail to report the arrest.  *Id.*  The University obtained a copy of the police report from Polizzi's arrest, which stated that Polizzi's girlfriend, who then shared a residence with him, claimed that Polizzi started a verbal argument about her coming home late.  Willey Aff. ¶ 8 & Ex. A.  Polizzi  grabbed and broke her telephone, then grabbed her and shoved her to the couch; she struck the back of her head on the wood of the couch, which caused pain and swelling, and she fell on her already hurt right ribs and further injured herself causing severe pain.  Willey Aff. ¶ 8 & Ex. A.  Polizzi told Huffman that she had gotten out of control, and he pushed her away from him.  Willey Aff. ¶ 7.

Later that day, University administrators convened a meeting that included University President Jerry Israel ("Israel"), Vice President and Provost Everette Freeman ("Freeman"), Director of Athletics Huffman, Associate Director of Athletics Sue Willey ("Willey"), and Department Chair Lisa Hicks ("Hicks").  Willey Aff. ¶ 10.  In deciding how to handle Polizzi's arrest, the University administrators evaluated Polizzi's ability effectively and responsibly to carry out the duties of his position as head football coach and teacher in health and physical education and whether he would do so without causing concern for the well being of any student-athletes, classroom students,

members of his staff, or any other persons with whom he interacted.  Freeman Aff. ¶ 6.  The University administrators considered public information concerning the accusations against Polizzi, their personal knowledge of Polizzi's conduct during his history at the University, and information provided by Polizzi describing the incident in question and the circumstances associated with it. Freeman Aff. ¶ 7.

After considering this information, the consensus of the University administrators at this meeting was that Polizzi could continue with his coaching and teaching responsibilities and allowing him to do so would not compromise the welfare of any persons with whom he interacted on campus. Freeman Aff. ¶ 8; Willey Aff. ¶ 12 & Ex. B.  On September 13, Huffman wrote a letter to Polizzi informing him of the University administrator's decision in which Huffman wrote, "You are important to us Joe, as an employee and a member of the university family.  We want to work together on this for good of the department and university, but even more for your sake.  You have friends who care about you."  Willey Aff. Ex. B.

On September 21, 2001, the State of Indiana chose not to file charges against Polizzi.  Smith Aff. Ex. A.

### D.  WITHERSPOON'S CONFRONTATION WITH DR. PENNELL

In October 2001, Witherspoon was a student in the University's School of Education, and Dr. Greta Pennell ("Dr. Pennell"), Director of the University's Masters Program in Curriculum and Instruction, was his academic advisor.  Witherspoon Dep. at 123-24.  Witherspoon had asked the School of Education to provide him with a copy of his academic records on several occasion, but the University had refused.  *Id.* at 125-26.  On October 24, 2001, Witherspoon went to Dr. Pennell's

4

office to gain access to his educational records, which were in her office.  Witherspoon Dep. at 125-27 & Dep. Exs. 19, 25.  After Witherspoon looked over the records, he attempted to take them from Dr. Pennell's office to make a copy.  Witherspoon Dep. at 129.  Dr. Pennell grabbed Witherspoon and told him that he could not take the file from her office.  *Id.* at 129, 134-36.  Witherspoon told Dr. Pennell that he was going to copy the file, and Dr. Pennell blocked the doorway.  *Id.* at 136.  Witherspoon took the file to another University building where he photocopied it.  *Id.* at 129.

Following this incident, Dr. Pennell filed a complaint against Witherspoon.  *Id.* at 129.  In response to this complaint, Greg Smith ("Smith"), the University's Director of Campus Life, described Witherspoon's conduct as disruption and failure to comply with a University official.  Witherspoon Dep. Ex. 25.  Smith determined that Witherspoon had acted inappropriately in this confrontation with Dr. Pennell,[1] and the University placed Witherspoon on social conduct probation for one year and directed him not to have any contact with Dr. Pennell.  Witherspoon Dep. Ex. 21.

Witherspoon appealed the University's decision and sanctions with respect to this incident to Smith and Dr. David Wantz ("Wantz"), the University's Vice President for Student Affairs.  Witherspoon Dep. at 132-33; Witherspoon Dep Exs. 22, 23.  Witherspoon also filed a grievance against Dr. Pennell pursuant to the student grievance process.  Witherspoon Dep. at 137.  Charles

---

[1]During the initial investigation of the incident, it appears that Dr. Pennell alleged that she informed Witherspoon that he was not permitted to take the file from her office before she touched him.  Witherspoon Dep. Ex. 25.  It is unclear whether Witherspoon disputed that allegation during the investigation.  Witherspoon Dep. Ex. 22, 25.  After Witherspoon filed a student grievance against Dr. Pennell, the Grievance Officer concluded that Witherspoon did not deny that allegation.  Witherspoon Dep. Ex. 25.  However, because the Court is to draw all inferences from the disputed facts in favor of the non-movant in a motion for summary judgment, the Court will assume that Witherspoon did deny Dr. Pennell's allegation that she informed Witherspoon that he was not permitted to remove the file before she grabbed him, but that the grievance report concluded otherwise.

Guthrie ("Guthrie"), the Grievance Officer denied Witherspoon's grievance against Dr. Pennell and in his report found that "Mr. Witherspoon's own description of his actions (as well as [Dr.] Pennell's description) indicates that his clear and persistent intent to ignore the directives of his professor actually created a situation in which some degree of verbal and physical confrontation was inevitable." Witherspoon Dep. at 137-38; Witherspoon Dep. Ex. 25.

Witherspoon then filed a charge of discrimination with the Indiana Civil Rights Commission ("ICRC") alleging he was harassed by Dr. Pennell. Witherspoon Dep. At 139; Witherspoon Dep. Ex. 26. The ICRC dismissed this charge after finding that no probable cause existed to find that discrimination occurred. Withesrpoon Dep. at 140; Witherspoon Dep. Ex. 27. Witherspoon filed another charge with the ICRC relating to this incident alleging that the University retaliated against him when Dr. Pennell recommended that he be disciplined for his conduct. Witherspoon Dep. at 140; Witherspoon Dep. Ex. 28. The ICRC dismissed this charge after finding that no probable cause existed to believe discrimination occurred. Witherspoon Dep. 141; Witherspoon Dep. Ex. 29.

## E. WITHERSPOON'S INVOLVEMENT IN AN INCIDENT ON THE SIDELINES OF A UNIVERSITY FOOTBALL GAME

Following the University's 2003 football season, Polizzi called a meeting with assistant football coaches Chris Keevers ("Keevers"), Kent Kinkade ("Kinkade"), and Witherspoon to discuss behavioral issues exhibited by, and internal turbulence among, the coaching staff during that season. Willey Aff. ¶ 15 & Ex. C. Witherspoon was not informed of the meeting beforehand, so he met with Polizzi one-on-one. Witherspoon Dep. at 60. During these meetings, Polizzi expressed concern

about an altercation between Keevers and Witherspoon that nearly resulted in a fist-fight on the sideline of a game in full view of several team members.  Willey Aff. Ex. C.

### F.  THE DEFENSIVE COORDINATOR POSITION

In or before March 2004, Kinkaid, the University football team's offensive coordinator, left the coaching staff.  Willey Aff. ¶ 26.  Polizzi demoted Keevers from defensive coordinator.  *Id.*  At the time, Witherspoon was receivers coach.  Willey Aff. ¶ 25.  The University posted an advertisement for an immediate opening for an assistant football coach.  Willey Aff. ¶ 28; Willey Aff. Ex. E.  Witherspoon saw this opening posted on the University's internal website.  Witherspoon Dep. at 145.  Witherspoon informed Polizzi that he would like to apply for the position.  *Id.* at 145-46.  Four other candidates applied to fill this opening.  Willey Aff. ¶ 29.

The University hired Robert A. Bartolomeo ("Bartolomeo") for the assistant football coach position.  Willey Aff. ¶ 30.  Bartolomeo had previously held head football coach position at Butler University and the defensive coordinator positions at Butler University, Ball State University, and Central Michigan University.  Willey Aff. Ex. F.  Witherspoon claims that the University did not consider him for the defensive coordinator position because Polizzi did not interview Witherspoon for the position.  Witherspoon Dep. at 145-49.  At this time, Witherspoon had been coaching under Polizzi for approximately eight years.  *Id.* at 142.

### G.  WITHERSPOON'S COMPLAINTS AGAINST THE UNIVERSITY

During his tenure as a student and employee at the University, Witherspoon filed a number of complaints against the University alleging discrimination.

Witherspoon filed a complaint with the ICRC on January 28, 2000, regarding his attempt to enroll in the University's physical therapy program. Witherspoon Dep. at 153 & Ex. 33. The ICRC dismissed the complaint after finding that the available evidence did not substantiate Witherspoon's allegation of unlawful discrimination on the basis of race. Witherspoon Dep. at 153 & Dep. Ex. 34. The University and Witherspoon subsequently entered into an agreement concerning Witherspoon's conditional acceptance to the University's physical therapy program. Witherspoon Dep. at 154 & Dep. Ex. 35.

In November 2000, Witherspoon filed a Complaint against the University with the Equal Employment Opportunity Commission ("EEOC") alleging that the University discriminated against him on the basis of his race with respect to its reimbursement of travel expenses he incurred as an assistant football coach. Witherspoon Dep. at 154 & Dep. Ex. 36. The EEOC dismissed this charge after finding that no probable cause existed to believe discrimination occurred. Witherspoon Dep. at 156 & Dep Ex. 37. Witherspoon also filed a claim in Marion County Small Claims Court seeking reimbursement for the same travel expenses that were the subject of his EEOC charge. Witherspoon Dep. at 157 & Dep. Ex. 38. The Marion County Small Claims Court entered judgment in this matter in favor of the University. Witherspoon Dep. at 157 & Dep. Ex. 39.

In January 2001, Witherspoon filed a Complaint against the University with the United States Department of Education Office for Civil Rights ("USDOE") alleging that the University discriminated against him on the basis of his race and sex with respect to his admission to the Master of Physical Therapy Program, his financial aid disbursements, and the attitude demonstrated toward him by the University's administrators, staff, and teachers. Witherspoon Dep. at 158 & Dep. Ex. 41.

8

The USDOE determined that no sufficient evidence existed to support a violation of the law. Witherspoon Dep. at 158-59, Witherspoon Dep. Ex. 41.

In October 2001, Witherspoon filed a complaint with the ICRC against the University alleging that the University discriminated against him on the basis of his race and sex with respect to the grades he received in two courses. Witherspoon Dep. at 159 & Dep. Ex. 42. The ICRC dismissed this charge after finding that no probable cause existed to believe that discrimination occurred. Witherspoon Dep. at 159 & Dep. Ex. 43. Witherspoon also filed an internal grievance with the University with respect to the grades addressed by the ICRC complaint. Witherspoon Dep. at 160. The Grievance Officer found that no cause existed to change either grade. Witherspoon Dep. at 160 & Dep. Ex. 44. Witherspoon appealed these findings. Witherspoon Dep. at 160 & Dep. Ex. 45. The panel of arbitrators who heard this appeal affirmed the judgment of the Grievance Officer. Witherspoon Dep. at 161 & Dep. Ex. 46.

On January 20, 2002, Witherspoon wrote a letter to University President Israel complaining that the University discriminated against him on the basis of his race in numerous respects. Witherspoon Dep. at 163 & Dep. Ex. 47. In response to these complaints, the University asked another employee to apologize to Witherspoon and worked with him to gain entry to the University's physical therapy program. Witherspoon Dep. at 163-65.

In the spring term of the 2004 academic year, Witherspoon was enrolled at the University to obtain a certification of mild intervention for special education. Witherspoon Dep. at 67, 113 & Dep. Ex. 7. Two of the courses in which Witherspoon enrolled were offered at both the undergraduate and graduate level. Witherspoon Dep. at 67. Witherspoon registered for these courses at the graduate level. *Id.* at 69. Pursuant to the University's tuition discount policy for employees,

Witherspoon received a one-half tuition discount for graduate-level courses and a full tuition discount for undergraduate level courses. *Id.* at 70. Witherspoon twice complained to Freeman about the University's refusal to treat the two courses as undergraduate and reimburse him half of his tuition. *Id.* at 204-06. Witherspoon argued that because the courses were offered at both levels, Dr. Pennell, his advisor at the time, should have directed him to the undergraduate course because that would have saved him money. *Id.* at 114. Freeman declined to take action on Witherspoon's complaint and said that Witherspoon should take responsibility for the issue. *Id.* at 208-09. In June 2004, President Israel informed Witherspoon that the University would not change his academic history to reflect these courses as taken at the undergraduate level because that was "neither ethical academically nor consistent with University . . . policies regarding enrollment and academic history." *Id.* at 69 & Dep. Exs. 7,8.

On May 3, 2004, Witherspoon complained to Willey about the University's refusal to consider these two courses as undergraduate rather than graduate courses for tuition discount purposes. Witherspoon Dep. at 178-79. Witherspoon also complained to Willey about the University's decision to hire Bartolomeo as defensive coordinator. *Id.* Witherspoon said that he thought the decision was wrong, but did not tell Willey that he believed the decision was discriminatory. Witherspoon Dep. at 179.

On May 17, 2009, Witherspoon complained to Stant Clark ("Clark"), the University's Director of Human Resources, that the University had discriminated against him on the basis of his race. Witherspoon Dep. at 165-66; Pl.'s Ex. G. Witherspoon complained that the University discriminated against him by not assigning him to teach additional classes, not allowing him to conduct personal training sessions in the University's fitness facilities unless the individuals he was

training purchased memberships to those facilities, not giving him the opportunity to negotiate his salary, not interviewing or considering him for the Defensive Coordinator position, and not allowing him to take independent study classes when it allowed another individual to do so.  Pl.'s Ex. G. Witherspoon stated that he believed this conduct was unfair and biased treatment and may have violated Title VII.  *Id.*

## H.  WITHERSPOON'S ARREST & SUSPENSION

On Friday May 21, 2004, Witherspoon was arrested at Mike's Car Wash in Indianapolis and subsequently charged with felony battery and carrying firearms without a permit.[2]  Witherspoon Dep. at 119.  The police report describing the incident included statements by Witherspoon, the victim, Scott Condre ("Condre"), and a customer who witnessed the incident.  Freeman Aff. Ex. A.

Condre alleged that Witherspoon pulled his car up to the rack to get it washed, and Condre told him to put the car in neutral.  *Id.*  Condre alleged that Witherspoon began to move the car forward while he was beginning to spray the front of the car off.  *Id.*  Condre said that he slapped the front of the windshield to get Witherspoon's attention.  *Id.*  Condre said that Witherspoon got upset and yelled at him and continued through the wash.  *Id.*  Condre said that Witherspoon drove around to the front of the business and got out of his car and confronted him.  *Id.*  Condre said he told Witherspoon to get back in his car and leave, but Witherspoon suddenly punched him in the mouth.  *Id.*  Witherspoon's punch knocked three of Condre's teeth loose, broke a bone in his upper jaw, and split his lip and gum.  *Id.*

---

[2] Witherspoon had a permit for the weapon and that charge was subsequently dropped. Witherspoon Aff. at 22.

Witherspoon denied trying to hit Condre with his car and said that Condre slapped his windshield several times. *Id.* Witherspoon said that when he got out of his car, Condre sprayed his shoes with water and stepped on them, and then Witherspoon hit him. *Id.* The police officer noted that Witherspoon's shoes and clothes appeared to be dry. *Id.*

The witness stated that he saw Witherspoon and Condre talking, and Condre appeared to be smiling. *Id.* The witness did not realize they were arguing. *Id.* The witness said he saw Witherspoon hit Condre and knock him to the ground. *Id.*

Witherspoon was released from jail on Saturday, May 22, 2004. Witherspoon Dep. at 82. Witherspoon attempted to notify Polizzi and Willey about his arrest, but they were not in their offices. *Id.* at 83. Witherspoon called Polizzi and Clark on Monday, May 24, to inform them of the arrest. *Id.* at 85. Witherspoon told Polizzi his side of the story, stating that Condre had used abusive and foul language toward him, was physically aggressive toward him, attempted to provoke him, acted like he was going to hit him, sprayed him with water as he tried to walk away, and eventually swung at him, at which time Witherspoon acted in self-defense and hit Condre and knocked him out. *Id.* at 92, 94-98. Witherspoon told Clark essentially the same story. *Id.* at 88.

Later that day University administrators met to discuss Witherspoon's status as an employee. The administrators at the meeting were Freeman, Clark, Willey (now the Athletic Director), Wantz, Polizzi, Associate Dean of Teacher Education Kathy Moran, and Chief of University Police Keith Smith. Willey Aff. ¶ 35. In deciding how to address Witherspoon's arrest, these administrators considered whether Witherspoon could effectively and responsibly carry out the duties of his position and whether they believed that he would do so without causing concern for the well being of those individuals with whom he interacted on campus. Freeman Aff. ¶ 14.

To answer these questions, the administrators considered information provided by Witherspoon to Polizzi and Clark describing the incident that led to Witherspoon's arrest, the police report describing the victim's and the witness's accounts of the incident that led to his arrest, and their own personal knowledge of his past conduct.  Freeman Aff. ¶ 15.  The administrators considered Witherspoon's conduct as described by the victim and a witness and evidenced by the extent of the injuries to the victim.  Freeman Aff. ¶ 16.  They considered Witherspoon's expressed belief that, if the victim engaged in the conduct Witherspoon alleged, it would have justified Witherspoon's punching him.  Freeman Aff. ¶ 17.  They also considered that Witherspoon had been involved in other incidents at the University in which he had exhibited anger management problems that became physically confrontational, specifically the confrontations between Witherspoon and Dr. Pennell and Witherspoon and Keevers.  Freeman Aff. ¶ 18.

The University administrators decided in this meeting that they believed Witherspoon could not effectively carry out the duties assigned to him and could not do so without causing concern for the well being of those with whom he interacted as a University employee.  Freeman Aff. ¶ 19.  Based on this consensus, Freeman decided that Witherspoon's employment at the University should be suspended pending the outcome of the University's investigation into the events that led to his arrest.  Freeman Aff. ¶ 26.  Witherspoon has remained on suspension pending resolution of the criminal charges and the University's review of the trial evidence and outcome.

Witherspoon was tried on January 22 and 23, 2007, and convicted by a jury of felony battery.  Smith Aff. ¶¶ 10, 11.  Witherspoon appealed, and on October 12, 2007, his appeal was dismissed by the Indiana Court of Appeals with prejudice.  *Id.* ¶¶ 14, 15.

13

## I.  THE YATES CASE

In October 2004, Jay Yates ("Yates"), the University's part-time head wrestling coach, failed to return to campus following the University's fall break.  Willey Aff. ¶¶ 37, 38.  Willey later learned from another of the University's wrestling coaches that Yates had been arrested in California.  Willey Aff. at ¶ 39.  Yates later told Willey that he did not return to campus because he had been arrested in California on allegations that he had committed rape.  Willey Aff. ¶¶ 40, 41.  Willey informed Yates that his arrest and failure to report his arrest to the University violated the University's off-duty conduct policy and instructed Yates that he could either resign his employment with the University or he would be terminated.  Willey Aff. ¶ 42.  Yates resigned his employment.  Willey Aff. ¶ 43. In July 2005, the University rehired Yates after Willey learned that the October 2004 arrest did not result in criminal charges being filed against him.  Willey Aff. ¶¶ 45, 46.

## II.  STANDARDS

### A.  SUMMARY JUDGMENT

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990), *cert. denied*, 499 U.S. 923 (1991).  Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

14

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  Summary judgment is the "put up or shut up" moment in a lawsuit.  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), *reh'g denied*.  Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies.  *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory.  *Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of

the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

On certain occasions, the Seventh Circuit has suggested that a court approach a motion for summary judgment in an employment discrimination case with a particular degree of caution. *See e.g., Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989). The language implied that summary judgment might be less appropriate in this context based upon the presence of issues of motive and intent. *Holland*, 883 F.2d at 1312. As the Seventh Circuit has emphasized, however, these cases do not establish a heightened summary judgment standard for employment-related cases. Instead, the language from the prior cases simply means "that courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). Even when discriminatory intent is at issue, summary judgment is appropriate when the nonmovant presents no evidence to indicate motive or intent in support of his position. *See Holland*, 883 F.2d at 1312. Further, the nonmovant will not defeat summary judgment merely by pointing to self-serving allegations without evidentiary support. *See Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994).

16

## B.  TITLE VII AND SECTION 1981

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  Title VII also makes it unlawful for an employer to retaliate against an employee for various protected activities, including complaints of discrimination.  42 U.S.C. § 2000e-3(a).

Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Although Title VII and § 1981 differ in the types of discrimination that they proscribe, the methods of proof and elements of the case are essentially identical.  *See Johnson v. City of Fort Wayne*, 91 F.3d 922, 940 (7th Cir. 1996). *Accord Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir.1999), *cert. denied*, 530 U.S. 1204 (2000) (holding that courts employ the same legal framework in analyzing Title VII and § 1981 claims). Because the analysis for Witherspoon's claims under Title VII and § 1981 are the same, the Court makes only a single analysis.

A plaintiff can prove a claim for race discrimination under Title VII or § 1981 under the direct method or the indirect burden-shifting method.  *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263 (7th Cir. 2004).  Under the direct method, the plaintiff must show either "an acknowledgment of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination."  *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (citing *Troupe v. May Dep't Stores*, 20 F.3d 734 (7th Cir. 1994)). Circumstantial evidence may come in the form of: "(1) suspicious timing, ambiguous statements,

17

etc., (2) evidence that similarly situated employees were treated differently, or (3) evidence that the employee was qualified and passed over for the job and the employer's reason for the difference in treatment is a pretext for discrimination." *Id.*

Where a plaintiff has no direct evidence of discrimination, he must present sufficient evidence to establish a prima facie case of discrimination under the burden-shifting methodology of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To prove a prima facie case of discrimination with respect to his claim that the University suspended him because of his race, Witherspoon must show that: (1) he was a member of a protected class; (2) he was performing up to the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer needs to find another person to perform that job after the employee is gone. *See Panoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007) (citing *Matthews v. Allis Chalmers*, 769 F.2d 1215 (7th Cir. 1985)).[3] Once Witherspoon has established his *prima facie* case,

---

[3] Prior to *Pantoja*, the Seventh Circuit had been applying a different iteration of the *McDonnell Douglas* burden shifting framework in discriminatory termination cases. Under the previous model, the fourth element is that the plaintiff must show that "he was treated less favorably than similarly situated individuals who are not members of his protected class." *Pantoja*, 495 F.3d at 845 (quoting *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177 (7th Cir. 1997)). In *Pantoja*, the Seventh Circuit explained that requiring a plaintiff to point to a similarly situated comparator would prove an impossible task for some plaintiffs, especially if the employer had no other similarly situated employees. *Id.*

Nevertheless, some cases have continued to apply the pre-*Pantoja* formulation, at least in cases in which the plaintiff could point to similarly situated employees who were treated better. *See Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687 (7th Cir. 2007).

In the case at bar, the outcome would not change whether the Court applied one test or the other. If the Court applied the pre-*Pantoja* standard, Witherspoon would fail to make his *prima facie* case, as demonstrated below. Applying the *Pantoja* standard, even assuming that Witherspoon has set forth his *prima facie* case, summary judgment would still be appropriate because, as demonstrated below, Witherspoon is unable to prove that the University's proffered legitimate reason is pretext.

then the University must offer a legitimate, nondiscriminatory reason for its adverse action.  *See*

*Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922-23 (7th Cir. 2001).  If the University does so,

Witherspoon "must rebut that reason by showing that [the University's] proffered reason is actually

pretext for discrimination."  *Id.*  "The plaintiff must meet each prong of the prima facie test before

it becomes necessary to reach the issue of pretext."  *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742,

744 (7th Cir. 2002).

With respect to Witherspoon's failure to promote claims, a similar burden shifting approach

is applied.

> In order to make a prima facie showing of discrimination in a failure to promote case,
> the plaintiff must demonstrate that (1) he was a member of a protected group; (2) he
> applied for and was qualified for the position sought; (3) he was rejected for the
> position; and (4) those who were promoted had similar or lesser qualifications for the
> job.  If the plaintiff succeeds in establishing a prima facie case of discrimination, the
> burden shifts to the defendant, who must explain why it failed to promote the
> plaintiff.  If the defendant provides reasons that are nondiscriminatory on their face,
> the burden returns to the plaintiff who then must demonstrate that defendant's
> proffered reasons are pretextual.

*Ghosh v. Ind. Dep't of Envt'l Mgmt.*, 192 F.3d 1087, 1090-91 (7th Cir. 1999) (internal citations

omitted).

With respect to Witherspoon's retaliation claims, the Seventh Circuit clarified the proper

summary judgment standard for courts considering Title VII retaliation claims in *Stone v. City of*

*Indianapolis Public Utilities Division*, 281 F.3d 640, 643-44 (7th Cir. 2002).  There are two distinct

routes to prevent/obtain summary judgment in a retaliation action.  *See id.* at 644.  The first avenue

"is to present direct evidence (evidence that establishes without resort to inferences from

circumstantial evidence) that he engaged in protected activity (filing a charge of discrimination) and

as a result suffered the adverse employment action of which he complains."  *Id.*  The second avenue,

if Witherspoon has no direct evidence of retaliation, is an adaptation of the test first enunciated in *McDonnell Douglas*, 411 U.S. at 792. The second approach requires that Witherspoon show

> that [1] after filing a charge [2] only he, and not any similarly situated employee who did not file a charge, [3] was subjected to an adverse employment action [4] even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial.

*Stone*, 281 F.3d at 644. Witherspoon need not present evidence of a "causal link" between the protected expression in which he engaged and the adverse employment action of which he is complaining. *See id.* at 642-43 (reasoning that the imposition of a causation requirement on a plaintiff proceeding under the *McDonnell Douglas* retaliation test essentially required direct evidence of retaliation rather than indirect evidence for which *McDonnell Douglas* was designed).

### III. DISCUSSION

### A. ABANDONMENT OF CLAIMS

In Witherspoon's Brief in Opposition to Defendant's Motion for Summary Judgment, Witherspoon offered neither evidence nor argument to refute the University's position that there are no genuine issues of material fact with respect to the following claims: (1) discrimination under Title VII and § 1981 for his ban from campus and removal from classes; (2) discrimination under Title VII and § 1981 for disparate compensation; (3) retaliation under Title VII and § 1981 for his ban from campus; (4) retaliation under Title VII and § 1981 for failure to promote; and (5) retaliation under Title VII and § 1981 for disparate compensation. If a non-moving party fails to respond to issues raised and supported in a motion for summary judgment, summary judgment should be

entered against the non-moving party.  Fed. R. Civ. Pr. 56(e); *see also Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (a claim is abandoned when non-moving party "fail[s] to delineate [that claim] in his district court brief in opposition to summary judgment").   Therefore, the University is entitled to summary judgment on these five issues.


**B.  DISPARATE TREATMENT IN WITHERSPOON'S SUSPENSION**

Witherspoon contends that he has established a prima facie case under the indirect method. The University contends that summary judgment on Witherspoon's claim is warranted because, under the pre-*Pantoja* formulation of the *McDonnell Douglas* burden-shifting framework, Witherspoon has failed to show that (1) he was meeting the University's legitimate expectations at the time of his termination, and (2) the University did not treat similarly situated white employees more favorably.  The University further contends that even if Witherspoon has made out a *prima facie* case, he cannot show that the University's legitimate, non-discriminatory reasons for suspending him were a pretext for discrimination.  Because of the uncertainty surrounding the requirements to make a *prima facie* case discussed *supra*, the Court will assume that Witherspoon has established a *prima facie* case and consider whether the University has articulated a legitimate, non-discriminatory reason for his suspension, and if so, whether Witherspoon has demonstrated that this reason is pretext for discrimination.[4]

_____

[4] Since Witherspoon's argument that the University's proffered reason for his suspension was pretext is based on a claim that similarly situated white employees were treated more favorably, it does not matter whether this claim is analyzed as part of the *prima facie* case or as proof of pretext.

21

The University contends that it has offered a legitimate, non-discriminatory reason for Witherspoon's suspension.  Specifically, the University asserts that, based on the facts that formed the basis of his arrest and his history of confrontational conduct, Witherspoon could not effectively and responsibly carry out the coaching duties assigned to him and he could not do so without causing concern for the well being of those with whom he interacted.  Witherspoon has conceded that, if true, this would be a legitimate, non-discriminatory reason.

In order to show pretext, Witherspoon must demonstrate that the University's proffered reason "is a lie or completely lacks factual basis." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000).  "Even if [the University's] reasons for [suspending Witherspoon] were mistaken, ill-considered or foolish, if [the University] honestly believed in those reasons then pretext has not been proven." *Crim v. Bd. of Educ. of Cairo Sch. Dist. 1*, 147 F.3d 535, 541 (7th Cir. 1998).  In short, Witherspoon "'must present evidence to suggest not that [the University] was mistaken in [suspending him] but that it was lying to cover up the true reason,' [his] race[.]" *Jordan v. Summers*, 205 F.3d at 343 (quoting *Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 966 (7th Cir. 1998)).

Witherspoon argues that the University's proffered explanation is pretext for discrimination for three reasons: (1) similarly situated white employees were treated better after exhibiting similar conduct; (2) there is other circumstantial evidence that the University discriminated against Witherspoon in other matters; and (3) there is an issue of material fact as to whether Witherspoon was the aggressor in the incident with Dr. Pennell, which the University relied on to support its finding that Witherspoon had a history of confrontational conduct.

22

**1.  <u>Other Similarly Situated Employees Treated Better Than Witherspoon</u>**

In determining whether two employees were similarly situated, "a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir.2000).  "[I]n disciplinary cases-in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason-a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Id.* (internal citations omitted).  These factors often include "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications." *Hill v. Stoughton Trailers, LLC.*, 445 F.3d 949, 952 (7th Cir. 2006) (quoting *Ajayi v. Aramark Bus. Servs. Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)).  In determining whether employees engaged in similar conduct, the Court should determine whether the employees "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617-18.  These requirements "should not be applied mechanically or inflexibly." *Hill*, 445 F.3d at 952.

First, Witherspoon alleges that he and Polizzi were similarly situated and engaged in similar conduct, but Polizzi was treated more favorably because he was able to keep his position following his arrest.  Witherspoon has failed to demonstrate that he and Polizzi were similarly situated.  Specifically, Witherspoon has not presented any evidence that Polizzi had a similar history of confrontational conduct.  Witherspoon does not dispute that the University considered his past confrontational conduct as a factor in determining how to discipline him following his arrest.  Without showing that Polizzi had a similar history of misconduct, Witherspoon cannot demonstrate

that Polizzi was a similarly situated employee. *See Jordan v. City of Gary*, 396 F.3d 825, 834 (7th Cir. 2005).

Second, Witherspoon contends that Yates was similarly situated and treated more favorably following his arrest. Witherspoon contends that, following his arrest, Yates was given the option to resign his position, rather than be terminated. Witherspoon contends that resigning, as opposed to being terminated, was a necessary condition to Yates's rehiring after the University learned that charges were not filed against him. Witherspoon has presented no evidence that there was any University policy that employees who had been suspended following an arrest were ineligible for reinstatement, while employees who resigned following an arrest were eligible. "[E]vidence [that] amounts to little more than conclusory statements, indications of opinion or speculation [] do not produce a genuine issue for trial under Rule 56(c)." *Jordan v. Summers*, 205 F.3d at 344. Witherspoon's status following his arrest was "suspended pending resolution of his criminal case and the University's investigation into the incident." Witherspoon has presented no evidence that he would have been ineligible for reinstatement if the criminal charges against him had been dropped. Therefore, Witherspoon has not raised an issue of material fact as to whether Yates was similarly situated but treated more favorably.

Witherspoon also alleges that two white coaches, Kinkade and Keevers, put hands on players, and grabbed, choked, and kicked them. Witherspoon alleges that players complained of this conduct to Willey and Polizzi, but no action was taken. Witherspoon Dep. at 192-93. Witherspoon argues that this is evidence that similarly situated white employees were treated better than him, since he was fired after being arrested for striking someone. Willey denies receiving letters from football

24

players complaining about physically abusive conduct by coaches on the football staff. Willey Aff. ¶ 23.

Witherspoon's claims are not sufficient to establish an issue of fact as to these allegations. Rule 56 requires "something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. Du Page County*, 715 F.2d 1238, 1243 (7th Cir. 1983). Allegations based on rumor or conjecture do not demonstrate sufficient particularity but rather must be based on personal knowledge. *Abioye v. Sundstrand Corp.*, 164 F.3d 364 (7th Cir. 1998). Witherspoon's deposition testimony does not demonstrate the basis for his allegations that Willey knew about this conduct. Witherspoon Dep. at 192-93. Witherspoon did not state that he saw any of the letters, or that he spoke with Willey subsequently about the complaints. On the other hand, Willey's affidavit denies that she was ever informed of any misconduct toward players. Willey Aff. ¶ 23. Even assuming that this misconduct occurred, the University's failure to discipline Kinkade and Keevers for grabbing, choking, and kicking players does not demonstrate that the University treated similarly situated white coaches better than Witherspoon without actual evidence that the University knew of such conduct.

Witherspoon also alleges that the University's treatment of his incident with Dr. Pennell is evidence of pretext, and another example of a similarly situated white employee being treated better. Witherspoon argues that he has presented evidence demonstrating that Dr. Pennell was the aggressor in the incident, and that she was not disciplined or terminated as a result of her conduct. Even when considering Witherspoon's evidence in a favorable light, this does not demonstrate pretext. Witherspoon offers no reason why he and Dr. Pennell were similarly situated. Witherspoon and Dr.

Pennell were employed in different departments, had different responsibilities, did not have the same supervisor, and did not have comparable backgrounds or experience.  In short, Witherspoon has not demonstrated any of the factors usually considered when determining whether employees are similarly situated.  *See Hill*, 445 F.3d at 952.  Nor has Witherspoon demonstrated that he and Dr. Pennell engaged in similar conduct.  Dr. Pennell was not arrested.  Even assuming that Dr. Pennell was the aggressor in the incident between them, her conduct in trying to prevent him from taking his file from her office did not rise to the same level as Witherspoon's assault for which he was arrested. The University's treatment of Dr. Pennell does not demonstrate pretext because she and Witherspoon were not similarly situated.

### 2.  Circumstantial Evidence of Bias

Witherspoon argues that he has presented evidence from which a trier of fact could infer bias. Specifically, Witherspoon points to the following claims:  the University allowed Keevers to teach additional classes while denying him such an opportunity; the University allowed Keevers to pursue an independent studies program while denying him such an opportunity; and the University paid Keevers and Kinkade higher salaries than him.  These contentions appear to be remnants of claims that Witherspoon has abandoned.  These contentions are not sufficient to prove that the University's proffered reasons for Witherspoon's suspension were pretext.

Regarding his claim that a white employee was allowed to teach additional classes while Witherspoon was denied such an opportunity, Witherspoon has not offered any evidence of particular classes that he was qualified to teach but was denied.  Witherspoon Dep. at 168-70. Similarly, with the claim that Witherspoon was denied the opportunity to pursue an independent

course of study, Witherspoon has not offered any evidence that he submitted a satisfactory proposal, or that the white coach was permitted to pursue an independent study despite failing to submit a satisfactory proposal.   Witherspoon Dep. at 179.   Witherspoon's unsupported claims are not sufficient to raise an issue of material fact as to whether the University had demonstrated bias against him in the past.  *See Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 408 (7th Cir. 1994) ("The non-movant does not satisfy its burden merely by pointing to self-serving allegations that otherwise are without evidentiary support").

Finally, as to the claim that Witherspoon was compensated disparately, Witherspoon has offered no admissible evidence that the alleged comparators were actually paid more than him.  In his brief, Witherspoon alleges that Kinkade and Keevers were paid more than him, and describes their salaries for the 2003-04 school year, but offers no evidence to support these numbers.  During his deposition, Witherspoon admitted he did not know the salaries of other and merely speculated that they were paid more.  *Id.* at 199-200.  This is not sufficient to establish an issue of material fact as to whether Witherspoon was in fact disparately compensated and from which a trier of fact could infer that the University's proffered reason for his suspension was pretext for discrimination.  *See Cliff*, 42 F.3d at 408.

### 3.  <u>The University's Reliance on Witherspoon's Disciplinary Record</u>

Withespoon argues that the University's reliance on his disciplinary record in the decision to suspend him was evidence of pretext.  Witherspoon argues that reliance on this record was inappropriate because the incident for which he was disciplined, the incident with Dr. Pennell, was not actually his fault.  However, it does not matter whether Witherspoon was actually the aggressor

in that situation.  What matters is what the University administrators who made the decision to suspend Witherspoon knew about the incident.  Witherspoon does not dispute that the investigations into the incident with Dr. Pennell concluded that Witherspoon was at fault.  Even if these investigations came to the wrong conclusion, the University's reliance on them is not evidence of pretext unless Witherspoon can demonstrate that the University administrators who decided to suspend him knew that they came to the wrong conclusion. *Crim*, 147 F.3d at 541.  Witherspoon only argues that he was not actually at fault in that incident, not that the University relied on the investigations in bad faith

Because Witherspoon has failed to demonstrate that the University's legitimate non-discriminatory reason for his suspension is pretext, the University is entitled to summary judgment on this claim.

### C. FAILURE TO PROMOTE

Witherspoon has failed to show sufficient evidence to avoid summary judgment on his failure to promote claim.  In this case, both whether Witherspoon has established a *prima facie* case and whether the University's proffered reason for failing to promote Witherspoon was pretext turn on whether Bartolomeo was more qualified for the Defensive Coordinator position than Witherspoon. Therefore, the Court will assume that Witherspoon has established a *prima facie* case, and will consider only whether the University's proffered reason is pretext.

Witherspoon has not provided any evidence that he was more qualified than Bartolomeo other than his own self-assessment of his qualifications.  Even assuming that Witherspoon's assessment that he was more qualified than Bartolomeo could be considered as evidence that he was

28

in fact more qualified, "evidence that shows that an employer incorrectly assessed its employee's abilities does not shed light on whether the employer is lying about that assessment." *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001).  Proof that the employer is mistaken in its assessment of qualifications is not proof of pretext; the plaintiff must show that the employer was lying. *See id.*; *Jordan v. Summers*, 205 F.3d at 343.  "[I]n order to establish pretext, [Witherspoon] must establish that [his] credentials were 'so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question[.]'"  *Jordan v. City of Gary*, 396 F.3d at 834 (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002)).

Witherspoon has failed to show that he was so superior to Bartolomeo that no reasonable person would have chosen Bartolomeo over Witherspoon.  It is undisputed that Bartolomeo had extensive experience as a defensive coordinator and head football coach, while Witherspoon had no experience in either capacity.  Moreover, Witherspoon admitted in his deposition that Bartolomeo "[had] a great record . . . . [and] years of experience." Witherspoon Dep. at 150.  Witherspoon has offered no evidence that the University's proffered explanation, that Bartolomeo was more qualified, was a lie.  The University is entitled to summary judgment on this issue.

## D. RETALIATION

Witherspoon has similarly shown insufficient evidence to avoid summary judgment on his retaliation claims.  Witherspoon proceeds under the direct evidence approach, asserting that there is a genuine issue as to whether the University terminated Witherspoon because he wrote a letter to Clark four days before his suspension complaining of discrimination.  To establish a *prima facie* case

for retaliation under the direct method, a plaintiff "must prove that he (1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citing *Moser v. Ind. Dep't of Corr.*, 406 F.3d 896, 903 (7th Cir. 2005)). Under the direct method of proof, two types of evidence are permissible, direct evidence and circumstantial evidence. *Id.* The former requires evidence that a decision maker had discriminatory animus; evidence that Witherspoon does not have in this case. The latter requires evidence of "a convincing mosaic of discrimination against the plaintiff." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Generally, in retaliation cases this circumstantial evidence is comprised of suspicious timing, ambiguous statements or behavior toward other employees; evidence that similarly situated employees were treated differently; or evidence that the employee did not deserve termination and that the employer's reason for termination was pretext for discrimination. *See Volovsek v. Wis. Dep't of Agric.*, 344 F.3d 680, 689-90 (7th Cir. 2003). Witherspoon claims that the suspicious timing of his termination, one week after complaining of discrimination, and evidence that other employees who were arrested and did not complain were not terminated is enough from which a jury could infer discriminatory animus.

The Court disagrees with Witherspoon's analysis. Suspicious timing alone is insufficient to prove a causal connection between Witherspoon's complaints of discrimination and his termination. Rather, Witherspoon must present evidence that the suspicious timing casts doubt on the University's actual reasons for his termination. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000); *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1034 (7th Cir. 1999). Witherspoon has presented no such evidence because he has not shown any ambiguity in the

University's decisions regarding his own termination, or its treatment of other employees.

The University's proffered reason for suspending Witherspoon was his arrest for assault. Witherspoon argues that this reason is pretext because other similarly situated white employees who did not complain of race discrimination were not suspended following arrests for assault. Witherspoon points to the arrests of Polizzi and Yates. As discussed above, Polizzi and Yates are not valid comparators. Polizzi and Witherspoon are not similarly situated because Polizzi did not have Witherspoon's history of confrontational conduct, a factor which the University considered in its decision to suspend Witherspoon. Yates is not a valid comparator because he was not treated better than Witherspoon. As discussed above, the Court fails to understand how being given the option between resignation and termination constitutes better treatment than suspension pending University investigation and resolution of criminal charges.

Witherspoon failed to meet his burden to demonstrate a causal connection between his protected activity and the University's decision to suspend Witherspoon's employment because of his arrest. The University in entitled to summary judgment on this claim.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the defendant's, The University of Indianapolis, Motion for

Summary Judgment is **GRANTED**.

IT IS SO ORDERED this 9th day of April, 2008.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Electronically distributed to:

Denise K. LaRue                                Brian R. Garrison
HASKIN LAUTER & LARUE                          BAKER & DANIELS
dlarue@hlllaw.com                              brian.garrison@bakerd.com

Meghan Uzzi Lehner                             Roberta Sabin Recker
HASKIN LAUTER & LARUE                          BAKER & DANIELS
mlehner@hllglaw.com                            rsrecker@bakerd.com